```
GEORGE S. CARDONA
Acting United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Section
KAREN I. MEYER (Cal. Bar No. 220554)
ELIZABETH R. YANG (Cal. Bar No. 196461)
Assistant United States Attorneys
Violent and Organized Crime Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-8559/1785
     Facsimile:  (213) 894-3713
     e-mail:   kim.meyer@usdoj.gov
               elizabeth.yang@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA
```

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>     v.<br><br>MICHAEL DENNIS WILLIAMS, and<br>ANTOINE LAMONT JOHNSON,<br><br>          Defendants. | No. CR 05-920(A)-RSWL<br><br>GOVERNMENT'S MOTION *IN LIMINE* TO INTRODUCE EVIDENCE PURSUANT TO FEDERAL RULE OF EVIDENCE 804(B)(6), FORFEITURE BY WRONGDOING; DECLARATIONS OF JOHN C. CALWILE, MICHAEL T. HALUALANI, ELIZABETH R. YANG, KAREN I. MEYER, JOSEPH P. O'DONNELL; EXHIBITS |

Plaintiff United States of America, by and through its counsel, the Acting United States Attorney for the Central District of California, hereby moves in limine for an order seeking to introduce the prior statements and identifications of Veronica Burgess on the ground that defendant Antoine Johnson has procured her unavailability for trial by wrongdoing, namely, having persons with whom he is associated threaten her to recant

1  prior statements and grand jury testimony and go into hiding.
2  Therefore, the government believes that Veronica Burgess' prior
3  statements and grand jury testimony should be admitted into
4  evidence under Federal Rule of Evidence 804(b)(6), forfeiture by
5  wrongdoing.
6      This motion is based on the attached memorandum of points
7  and authorities, declarations, and exhibits, the files and
8  records of this case, and any additional argument made at any
9  hearing on this motion in limine.

11 DATED: February 5, 2010            Respectfully submitted,

12                                    GEORGE S. CARDONA
                                      Acting United States Attorney
13
                                      CHRISTINE C. EWELL
14                                    Assistant United States Attorney
                                      Chief, Criminal Division
15

16                                    _____/s/_____
                                      KAREN I. MEYER
17                                    ELIZABETH R. YANG
                                      Assistant United States Attorneys
18
                                      Attorneys for Plaintiff
19                                    UNITED STATES OF AMERICA

TABLE OF CONTENTS

PAGE(S)

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . .  ii

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . 1

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     A.   FORFEITURE BY WRONGDOING . . . . . . . . . . . . . . . 2

          1.   Defendant Engaged or Acquiesced
               in Wrongdoing . . . . . . . . . . . . . . . . . . 4

          2.   The Wrongdoing Was Intended to - And Did -
               Procure the Declarant's Unavailability . . . . 14

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . 14

TABLE OF AUTHORITIES

**CASES**                                                              **PAGE(S)**

Davis v. Washington,
  547 U.S. 813 (2006) . . . . . . . . . . . . . . . . . . . 2

United States v. Mastrangelo,
  693 F.2d 269 (2d Cir. 1982) . . . . . . . . . . . . . . 3, 12

United States v. Riviera,
  292 F. Supp. 2d 827 (E.D. Va. 2003) . . . . . . . . . . . . 4

United States v. Scott,
  284 F.3d 758 (7th Cir. 2002) . . . . . . . . . . . . . . 2, 13

United States v. White,
  116 F.3d 903 (D.C. Cir. 1997) . . . . . . . . . . . . . . . 3

United States v. Zlatogur,
  271 F.3d 1025 (11th Cir. 2001) . . . . . . . . . . . . . . 3

**RULES**

Fed. R. Evid. 804(b)(6) . . . . . . . . . . . . . . . . . . 2

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION**

On August 2, 2009, the defense teams for defendants Michael Williams and Antoine Johnson were permitted to disclose the identities of certain of the government's civilian witnesses in the case, namely, Veronica Burgess and Leevester Davie. The next day, Ms. Burgess received death threats and, in the face of those threats, recanted the prior statements and grand jury testimony she had provided to the government in 2004 and 2005. As proof of that recantation, defendant Johnson filed a declaration dated August 23, 2009, by his investigator, Christian S. Filipiak, attesting to the statements Ms. Burgess purportedly conveyed to him during an interview, recanting all prior information she had provided to the government regarding a planning meeting that took place at Fannie Mae's restaurant a few days before the armored truck robbery in which she overheard discussion of the robbery, as well as identifying those who participated in that meeting, including defendant Johnson. (See Defendant Johnson's Motion for Reconsideration of Court's Ruling Denying Motion to Traverse Search Warrant of March 13, 2005, Ex. 1 (Filipiak Decl.), filed August 24, 2009) (CR 1097). Ms. Burgess has since disappeared, and the government has been unable to locate her. Absent locating Ms. Burgess and bringing her to court to testify, the government believes that her prior statements and grand jury testimony are admissible into evidence under Federal Rule of Evidence 804(b)(6), forfeiture by wrongdoing, because of the

1 wrongdoing committed by defendant Johnson in procuring her
2 unavailability.

**II.**

**ARGUMENT**

A. FORFEITURE BY WRONGDOING

Federal Rule of Evidence 804(b)(6) specifically states:

> (b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> *       *       *
>
> (6) Forfeiture by wrongdoing. A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.

Fed. R. Evid. 804(b)(6). To admit a statement against a defendant under this rule, the government must show by a preponderance of the evidence: "(1) that the defendant engaged or acquiesced in wrongdoing, (2) that the wrongdoing was intended to procure the declarant's unavailability, and (3) that the wrongdoing did procure the unavailability." United States v. Scott, 284 F.3d 758, 762 (7th Cir. 2002).[1] Defendant's "wrongdoing" need not consist of a criminal act, nor need it be "akin to murder, physical assault, or bribery." Id. at 763 (citing 30B Michael R. Graham, Federal Practice and Procedure

---

[1] The Supreme Court has also made clear that "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." Davis v. Washington, 547 U.S. 813, 833 (2006). The Supreme Court in Davis reasoned that "when defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce. While defendants have no duty to assist the State in proving their guilt, they do have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system." Id. (emphasis in original).

2

§ 7078 (Interimed. 2000) ("Rule 804(b)(6) is an attempt to respond to the problem of witness intimidation whereby the criminal defendant . . . through one means or another, often a simple telephone call, procures the unavailability of the witness at trial . . .")). The rule contemplates that "the use of coercion, undue influence, or pressure to silence testimony and impede the truth-finding function of trials" also qualifies. Id. at 764 ("We think that applying pressure on a potential witness not to testify, including by threats of harm and suggestions of future retribution, is wrongdoing."). See also United States v. Zlatogur, 271 F.3d 1025, 1028 (11th Cir. 2001) (holding verbal threats sufficient to apply Rule 804(b)(6)); United States v. White, 116 F.3d 903, 911, 913 (D.C. Cir. 1997) ("where a defendant has silenced a witness through the use of threats, violence or murder . . ., wrongfully procur[ing] the absence of [that] witness," the defendant forfeits both his Confrontation Clause rights and any objection under the hearsay rules).[2]

Neither must defendant personally commit the wrongdoing. "By its terms, Rule 804(b)(6) applies when a party 'has engaged or acquiesced in wrongdoing' intended to result in a witness' unavailability. This language is purposefully broad and does not require that a party actually commit the requisite wrongful act

---

[2] The same holds true with respect to defendant's right of confrontation. See United States v. Mastrangelo, 693 F.2d 269, 272-73 (2d Cir. 1982) ("Neither in criminal nor in civil cases will the law allow a person to take advantage of his own wrong. Thus, if a witness' silence is procured by the defendant himself, whether by chicanery, by threats, or by actual violence or murder, the defendant cannot then assert his confrontation clause rights in order to prevent prior grand jury testimony of that witness from being admitted against him. Any other result would mock the very system of justice the confrontation clause was designed to protect.") (citations and quotations omitted).

3

intended to procure the witness' unavailability." <u>United States v. Riviera</u>, 292 F. Supp. 2d 827, 832 (E.D. Va. 2003) (citing <u>United States v. Thompson</u>, 286 F.3d 950, 961 (7th Cir. 2002) and <u>United States v. Cherry</u>, 217 F.3d 811, 816 (10th Cir. 2000)).

Based on the attached declarations and exhibits, the government has proven by a preponderance of the evidence that defendant Johnson caused Veronica Burgess to be threatened with her life should she testify, thereby procuring her unavailability as a potential government witness. Consequently, her prior statements and grand jury testimony should be admitted at trial.

1.  <u>Defendant Engaged or Acquiesced in Wrongdoing</u>

The government protected Veronica Burgess' identity since first learning of her as a potential witness in May 2004. However, pursuant to court order, the government was required to disclose her identity as well as the identities of its other out-of-custody witness 45 days before trial. Because the trial date kept being continued, the government was not required to disclose Ms. Burgess' identity until August 2, 2009. As noted in the declaration of LAPD Detective Joseph O'Donnell dated August 31, 2009, filed in support of the Government's Oppositions to defendant Antoine Lamont Johnson's (1) Motion for Reconsideration of Court's Ruling Denying Motion to Traverse Search Warrant of March 18, 2005; and (2) Supplemental Motion <u>In Limine</u> to Preclude Identification Evidence, filed September 1, 2009 (CR 1155, 1156), Ms. Burgess started receiving death threats within 24 hours of the revelation of her identity:

- On the afternoon of August 3, 2009, Detective O'Donnell received a call from Ms. Burgess, informing him that "a white man and woman" had been to her house, wanting to know how they had identified where she lived. Ms. Burgess was angry, scared and nervous.

- Later on that same day, at approximately 8:00 p.m., Ms. Burgess called Detective O'Donnell again, informing him that her name had been given to the "Hoovers" and she had been receiving death threats.

- During that same call, Ms. Burgess' boyfriend/common-law husband, Patrick Smith, informed Detective O'Donnell in a loud and angry voice that he had been directed by a friend to call a "Hoover" gang member. According to Mr. Smith, his friend had informed him there had been a meeting of the "Hoovers" on Sunday (August 2), that "paperwork" had been shown, and that a "hit" had been put out on Ms. Burgess for "snitching on a boy fighting death." The friend then advised Mr. Smith to call the "Hoover" gang member. Mr. Smith told Detective O'Donnell that he had called the "Hoover" gang member and the "Hoover" confirmed that Ms. Burgess was "snitching on a boy fighting death" and a "hit" had been put on her.

- Before hanging up on Detective O'Donnell, Patrick Smith said that Detective O'Donnell had given his family the death penalty, and that "these people mean business" and that they were "killers."

- Ms. Burgess then called Detective O'Donnell again and asked to meet with the prosecutors the next morning (August 4).

5

- On the morning of August 4, 2009, Detective O'Donnell called Ms. Burgess to set up a meeting time.  Ms. Burgess, who sounded very tired, panicked, and upset, told Detective O'Donnell that her family had stayed up all night fearing a drive-by shooting on their house.  Ms. Burgess confirmed that she and Mr. Smith wanted to meet with the prosecutors on the case.

- During that same call, after berating Detective O'Donnell for the position in which the government had placed Ms. Burgess and her family, Mr. Smith asked whether Ms. Burgess would be served with a subpoena if she showed up to the meeting.  Detective O'Donnell told him that she would.  Mr. Smith then stated that she would not come, but he would.

- On that same day, August 4, 2009, Detective O'Donnell called Mr. Smith to set up a time for the meeting.  During this call, Mr. Smith told Detective O'Donnell that he had been called by "the mother of one of the guys in jail looking at death" and she wanted to meet.  The mother told Mr. Smith that "the government is trying to put her son to death" and that she needed to talk to him.

- Mr. Smith then advised Detective O'Donnell that he was going to meet with the mother and that they (he and Ms. Burgess) were going to cooperate with the defense.  Mr. Smith also told Detective O'Donnell that they were going to say that Ms. Burgess "was not there," that he was there instead and had told Ms. Burgess everything, and that therefore everything Ms. Burgess told Detective O'Donnell was "a lie."  Mr. Smith then stated that his family was better off cooperating with the defense.

6

- Detective O'Donnell asked Mr. Smith if he still wanted to meet with the prosecutors and he indicated that he did. Detective O'Donnell told him the prosecutors could meet later in the day and that he (Detective O'Donnell) would call him back around 4:00 p.m.
- Later on that same day, August 4, 2009, at approximately 4:00 p.m., Detective O'Donnell called Mr. Smith to find out when he would be arriving for the meeting. Unlike the prior telephone conversations, Mr. Smith sounded calm and spoke normally. Mr. Smith told Detective O'Donnell that he no longer needed or wanted to meet because he "took care of things."

The timing of the threats, the meeting of the Hoovers, and the fact that Mr. Smith was called by the mother of "one of the guys in jail looking at death," all point to defendant Johnson. First, at the government's last meeting with Ms. Burgess on July 16, 2009, the government showed a six-pack to Ms. Burgess containing a photo of defendant Williams to determine whether she could, in fact, definitively identify him as being present at the planning meeting at Fannie Mae's a few days before the robbery/murder. She could not. (See memorandum of interview dated July 16, 2009, attached hereto as Ex. 1). This report was produced to the defense on July 31, 2009, by email. (See correspondence dated July 31, 2009, from the government to defense counsel, attached hereto as Ex. 2). At this point, defendant Williams no longer had the motive to see Ms. Burgess not testify. She no longer had any evidence against him.

7

Second, defendant Johnson was housed in Administrative Detention (also referred to as the Special Housing Unit or the "SHU") of the Metropolitan Detention Center ("MDC") during this time. (See Declaration of John C. Calwile (Calwile Decl., ¶ 2). Because of his behavior in prison, defendant Johnson lost phone privileges on June 6, 2008, and they are not scheduled to be reinstated until April 11, 2013. (See id. ¶ 3.) While in the SHU, defendant Johnson received a visit from his attorney, Richard Lasting, on August 2, 2009, a little after noon, the date that defense counsel were allowed to disclose Ms. Burgess' identity to their clients.[3] (See excerpt of Attorney Log Book, attached hereto as Ex. 3, and SHU Entry Log, attached hereto as Ex. 4). The records show that defendant Williams, who was also in the SHU during this time, (also for his conduct in prison), did not receive a visit from his lawyers on this date.[4] As noted in the declarations of ATF SA Michael Halualani and of MDC Senior Officer John Calwile, inmates in the SHU communicate with other inmates in the prison through the vents and toilet pipes, and by sending notes or "kites" through the toilets. (See Calwile Decl., ¶¶ 4, 5; Declaration of Michael T. Halualani ("Halualani Decl."), attached hereto, ¶¶ 3a & b, 6c). In order to speak

---

[3] In conversations AUSA Yang has had with counsel for defendants Patrick Holifield and Larry Jordan (who learned the identities of Ms. Burgess and Mr. Davie through pretrial litigation in the capital case), both counsel have indicated to AUSA Yang that they understand that their ability to disclose the identities is governed by the trial date for their clients. (See Declaration of Elizabeth R. Yang ("Yang Decl."), attached hereto, ¶ 5.)

[4] Defendant Williams did make a legal call on August 3, 2009, at approximately 12:08 p.m. (See excerpt of SHU phone log, attached as Ex. 7.) However, by this point, the Hoovers had already met and put out a "hit" on Ms. Burgess.

8

through the vents, an inmate must stand on the toilet in his cell in order to be heard. (Calwile Decl., ¶ 4). According to Officer Calwile, defendant Johnson is constantly "on the vents," because Officer Calwile would see defendant Johnson standing on the toilet frequently, principally during day watch (6 a.m. to 2 p.m.). (Id.). Officer Calwile also states that SHU inmates can tell when officers come onto the range to patrol, because they will hear the doors to the range open, the range officer's keys rattle, and the radio traffic on the two-way radio carried by the officer. At this point they stop talking through the vents until patrol on the range is over. (Id., ¶ 6.) Finally, SHU inmates know that there are fewer staff on duty on the weekends, so chatter on the vents and through the toilets is more frequent during these times. (Id.). August 2, 2009, the date that Mr. Lasting apparently disclosed to defendant Johnson the identity of Ms. Burgess when he visited defendant Johnson in the SHU, was a Sunday. Thus, it is a reasonable inference that after learning of Ms. Burgess' identity on August 2, 2009, defendant Johnson passed this information along to another inmate or inmates in the institution, telling them to get the word out to the Hoovers that the name of the witness testifying against him was Veronica Burgess. That message was received, because that same day, the Hoovers called a meeting and put a "hit" out on Ms. Burgess' life. (See O'Donnell Decl., ¶ 8.b.i., dated August 31, 2009, filed in support of the Government's Oppositions to defendant Antoine Lamont Johnson's (1) Motion for Reconsideration of Court's Ruling Denying Motion to Traverse Search Warrant of March

9

18, 2005; and (2) Supplemental Motion In Limine to Preclude Identification Evidence, filed September 1, 2009 (CR 1155, 1156)).

Third, at a meeting that occurred between defense counsel and government counsel on July 7, 2009, after a hearing at which this Court ordered all counsel to confer on a realistic new trial date, Mr. Lasting and Ms. Jacks mentioned that their client, defendant Johnson, was keenly interested in the identity of Ms. Burgess and was keeping track of the 45-day marker before trial, the point at which he could learn Ms. Burgess' identity. At this juncture, Ms. Burgess' identity had already been disclosed to defense counsel because defense counsel had represented that it was necessary to be able to discuss Ms. Burgess in their death penalty reconsideration submissions to the Attorney General, which were submitted May 5, 2009. (CR 836). Accordingly, the government had disclosed Ms. Burgess' identity to defense counsel in an under seal filing on March 31, 2009, (CR 847), with the understanding memorialized in a protective order stipulation that further disclosure to their clients could not occur until 45 days before a firm trial date. (CR 841). During this July 7, 2009 meeting, Mr. Lasting and Ms. Jacks mentioned in passing that defendant Johnson had called exactly 45 days before the "last" trial date (which would have been July 21, 2009), to find out the out-of-custody witnesses' identities, and was upset when he was told that he could not be given that information because the trial date was going to be moved to provide the Attorney General additional time to respond to the death penalty reconsideration

submission.  (See Declaration of Elizabeth R. Yang ("Yang Decl."), attached hereto, ¶ 6a, and Declaration of Karen I. Meyer ("Meyer Decl."), attached hereto, ¶ 3).  That date would have been June 6, 2009.  (See CR 878, Altered Scheduling Order for Capital Case, at 5, n.8).  SHU phone logs confirm that defendant Johnson made two legal calls on June 6, 2009.  (See excerpt of SHU phone logs, attached hereto as Ex. 5).

Fourth, it is only defendant Johnson – not defendant Williams – that filed a declaration asserting that Ms. Burgess had recanted her prior statements and testimony to law enforcement.  As made clear in Investigator Filipiak's declaration dated August 23, 2009, sometime on August 4, 2009, Investigator Filipiak and one of defendant Johnson's lawyers went to Ms. Burgess' house and Ms. Burgess agreed to meet with them the next day.  (Defendant Johnson's Motion for Reconsideration of Court's Ruling Denying Motion to Traverse Search Warrant of March 13, 2005, Ex. 1 (Filipiak Decl.), ¶ 2, filed August 24, 2009) (CR 1097).  On August 5, 2009, Ms. Burgess met with the defense team for defendant Johnson and recanted.  Id.  As evidenced by Mr. Filipiak's declaration, it was only defendant Johnson who had an interest in seeing Ms. Burgess change her testimony.[5]  See, e.g.,

---

[5] At the hearing that took place on November 10, 2009, to consider, among other things, defendant Johnson's Motion for Reconsideration of Court's Ruling Denying Motion to Traverse Search Warrant of March 18, 2005, Ms. Jacks made the argument that "the mother of one of the guys in jail fighting death," as referenced in Detective O'Donnell's August 31, 2009 declaration, could be any one of the other individuals the government is investigating in this case.  This makes no sense.  The only two defendants who were in jail and facing death at the time were defendants Johnson and Williams, and as noted previously, defendant Williams had no motive to see Ms. Burgess' testimony change.  Further, as noted above, defense counsel for defendants Holifield and Jordan indicated that they understood they could

11

Mastrangelo, 693 F.2d at 271-72 (noting Second Circuit's conclusion as "understandable" the first trial court's determination that defendant was implicated in the murder of a witness because "[h]e was the only person that could gain from it . . . [he was] the only person that could have been helped by killing this witness. . .") (citations and quotations omitted). That same day, according to the attached records, defendant Johnson received a visit from his sister, Chetarah Sims. (See Ex. 4; Inmate Visiting History, attached hereto as Ex. 6.) Other than August 5, 2009, Ms. Sims had only visited defendant Johnson in all of 2009 on January 27, 2009. A reasonable inference would be that Ms. Sims went to visit defendant Johnson on August 5, 2009, to report what had happened with the Hoovers, Ms. Burgess, and defendant Johnson's lawyers, since defendant Johnson's lawyers met with Ms. Burgess on both August 4 and August 5, 2009. (See Halualani Decl., ¶ 6f).

Fifth, defendant Johnson's mother, Veronica Williams, is familiar with various Hoover gang members, including their lifestyle and activities. (See O'Donnell Decl., ¶ 12). Her boyfriend is a known Hoover by the name of "Baby Chip" (true name

---

not reveal the identity of Ms. Burgess to their clients at that juncture, because it was premature in relation to their own separate trial date. With respect to other individuals the government has been investigating but has not yet charged, such a claim is ludicrous in light of the timing of the threats Ms. Burgess received in relation to the disclosure of her identity.

Finally, at the hearing, Ms. Jacks stated that Patrick Smith, Ms. Burgess' husband, told Ms. Jacks the name of the "mother of the guy in jail fighting death" who contacted him, and it was not either the mother of defendant Johnson or defendant Williams. However, when the government inquired as to the name of this individual in open court in order to facilitate its investigation of the threats, defendant Johnson's counsel did not provide this information.

of Edmund Woods). (See id., ¶ 13). A photograph of defendant Johnson's mother (Ms. Williams), and Baby Chip, is attached to Detective O'Donnell's declaration as Ex. A.[6] (See O'Donnell Decl., ¶ 13). According to Detective O'Donnell, in the photograph, Ms. Williams and Baby Chip are "throwing" a Hoover gang sign (an H created by an upside down "V" with the first and second finger, with the thumb in the middle). (See id.). Credit reports and Department of Motor Vehicle records for Baby Chip and Ms. Williams (defendant Johnson's mother) indicate that they have a common address from 2008, and currently reside together at the same address in Moreno Valley. (See id., ¶ 14).

All of this circumstantial evidence points to one person and one person alone as the source of the threats to Ms. Burgess – defendant Johnson. Circumstantial evidence alone is sufficient. See Scott, 284 F.3d at 764 ("It would not serve the goal of Rule 804(b)(6) to hold that circumstantial evidence cannot support a finding of coercion. Were we to hold otherwise, defendants would have a perverse incentive to cover up wrongdoing with still more wrongdoing, to the loss of probative evidence at trial.") And as the rule makes clear, defendant Johnson need not have made those threats himself. He only must have engaged in wrongdoing or acquiesced in wrongdoing that lead to Ms. Burgess' unavailability.

---

[6] In contrast, according to Detective O'Donnell, he has no information that defendant Williams' mother, Gwendolyn Brice, is associated or involved with the Hoovers. (See O'Donnell Decl., ¶ 15.)

13

2. <u>The Wrongdoing Was Intended to - And Did - Procure the Declarant's Unavailability</u>

The second and third elements that the government must satisfy are whether defendant's wrongdoing - namely, the threats to Ms. Burgess' life - were intended to and did procure Ms. Burgess' unavailability. Of this, there is no doubt. The fact that Ms. Burgess received death threats within 24 hours of her identity being revealed to defendant Johnson demonstrates that these threats were designed to force her to recant her prior statements and identity, and to make herself unavailable as a government witness. As the attached declaration of Detective O'Donnell indicates, the government has actively attempted to locate Ms. Burgess to testify at trial, with no success. (<u>See</u> O'Donnell Decl., ¶ 16). There is no question that she is in hiding, and is unavailable.

### III.

### CONCLUSION

For the foregoing reasons, the government requests that the Court grant its motion <u>in limine</u> and admit into evidence Ms. Veronica Burgess' prior statements and grand jury testimony.